In re Robert L. MILLS, Debtor.

Robert L. MILLS, Appellant,

v.

SDRAWDE TITLEHOLDERS, INC., a California Corporation, Appellee.

No. 87–5960.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1987.

Decided March 2, 1988.

Richard N. Grey, Simke, Chodos, Silberfeld & Anteau, Los Angeles, Cal., for appellant.

Joseph D. Frascella, Santa Monica, Cal., for appellee.

Before SNEED, PREGERSON and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

The issue in this bankruptcy case is whether a debtor's failure to make repairs on property subject to a purchase money lien gives the mortgagee a non-dischargeable claim for tortious waste under Cal.Civ. Code § 2929 (West 1974).

## Background

On December 31, 1980, Robert L. Mills purchased the Beverly Hotel, a hotel for low-income transients, from Martin Edwards for $900,000. Before taking possession on March 1, 1981, Mills made a down payment of $100,000, and gave Edwards a wrap-around deed of trust for the balance of the purchase price. When Mills took possession of the property, it was in satisfactory condition and complied with all applicable codes and ordinances. Edwards subsequently transferred his interest in the property and deed of trust to Sdrawde Titleholders, Inc.

Mills made his monthly payments on the deed of trust for only three months, defaulting on June 1, 1981. He claims that he spent an additional $3,000 per month on maintenance during that period. He thereafter ceased making payments on the deed of trust or for maintenance, although he did tender several checks to Edwards on which he subsequently stopped payment.

Sdrawde instituted an action in state court for appointment of a receiver. On September 3, 1981, the court removed Mills from possession. At that time, 48 of the hotel's 67 rooms were uninhabitable. Poor sanitation and vermin infestations had rendered the building in violation of state and city housing laws. The building's fire equipment had deteriorated to an unsafe

level. In general, the condition of the building was far worse than it had been at the time Mills took possession some six months earlier.

A nonjudicial trustee's sale was held on April 30, 1982, and Sdrawde purchased the building for $100. At this time, Mills' obligation to Sdrawde, including principal, interest, late fees, taxes and insurance, but excluding amounts owed on prior liens, totalled $606,565.67. Thus, Sdrawde was left with a deficiency of $606,465.67. Over a six-month period, Edwards spent $125,000 repairing and rehabilitating the building, but it was some two years before the occupancy rate reached its previous level.

Mills filed for bankruptcy after the trustee's sale. Sdrawde brought this adversary proceeding seeking to have Mills' debt declared non-dischargeable under 11 U.S.C. § 523(a)(6) (1982) on the ground that Mills had committed waste on the property. After a trial, the bankruptcy court found that Mills had committed waste in the amount of $143,750, and that this debt was non-dischargeable. Mills appealed to the bankruptcy appellate panel, 73 B.R. 638, which affirmed by a divided vote.

### Discussion

■ The threshold issue in this case is whether Mills owes any debt at all to Sdrawde. Sdrawde was left with a deficiency of $606,465.67 after the trustee's sale. Under California law, however, "[n]o deficiency judgment shall lie in any event after any sale of real property ... under a deed of trust ... given to the vendor to secure payment of the balance of the purchase price of real property...." Cal.Civ. Proc.Code § 580b (West 1976).

Sdrawde sought to avoid the bar of section 580b by attempting to prove that Mills committed tortious waste on the property under Cal.Civ.Code § 2929. In *Cornelison v. Kornbluth*, 15 Cal.3d 590, 542 P.2d 981, 125 Cal.Rptr. 557 (1975), the California Supreme Court explained the delicate balance between the anti-deficiency statute and the mortgagee's statutory right to recover for waste:

> The primary purpose of section 580b is "in the event of a depression in land values, to prevent the aggravation of the downturn that would result if defaulting purchasers lost the land and were bur-

dened with personal liability." It is clear that allowing an action for waste following a foreclosure sale of property securing purchase money mortgages may often frustrate this purpose. Damages for waste would burden the defaulting purchaser with both loss of land and personal liability and the acts giving rise to that liability would have been caused in many cases by the economic downturn itself. *For example, a purchaser caught in such circumstances may be compelled in the normal course of events to forego the general maintenance and repair of the property in order to keep up his payments on the mortgage debt. If he eventually defaults and loses the property, to hold him subject to additional liability for waste would seem to run counter to the purpose of section 580b and to permit the purchase money lender to obtain what is in effect a deficiency judgment.* It is of course true that not all owners of real property subject to a purchase money mortgage commit waste solely or primarily as a result of the economic pressures of a market depression; indeed *many are reckless, intentional, and at times even malicious despoilers of property. In these latter circumstances to which we shall refer for convenience as waste committed in bad faith, the purchase money lender should not go remediless* since they do not involve the type of risk intended to be borne by him in promoting the objectives of section 580b alluded to above.

> Accordingly, we hold that section 580b should apply to bar recovery in actions for waste following foreclosure sale in the first instance but should not so apply in the second instance of "bad faith" waste.

15 Cal.3d at 603–04, 542 P.2d 981, 125 Cal.Rptr. 557 (citation omitted; emphasis added). Thus, Sdrawde's claim depends on whether the evidence produced at trial was sufficient to establish that Mills committed "bad faith" waste rather than merely failed to maintain the property because of economic difficulties.

The bankruptcy court found that Mills "knew and understood the requirements for regular maintenance, operation, and management," Finding of Fact (FF) No. 13, but that he diverted the income from the

hotel to "other uses," FF No. 14, even though he knew his failure to maintain the hotel "would lead to a substantial diminution in the value of the premises." FF No. 15. The court concluded that Mills' failure to act appropriately was "in bad faith and without just cause or excuse." FF No. 18.

■ These findings do not support the conclusion that Mills committed bad faith waste as defined by *Cornelison*. It is true that bad faith waste can be committed without any affirmative act of destruction or spoliation; the mere failure to maintain property can be enough. *See Hickman v. Mulder,* 58 Cal.App.3d 900, 908, 130 Cal. Rptr. 304 (1976) (allegation that defendants "failed to cultivate, irrigate, fertilize, fumigate, prune and do all other acts necessary to preserve ... citrus trees and vines" stated claim for waste on agricultural property); *see also Cornelison,* 15 Cal.3d at 597, 542 P.2d 981, 125 Cal.Rptr. 557. *But see Krone v. Goff,* 53 Cal.App.3d 191, 195, 127 Cal.Rptr. 390, 393 (1975) ("waste does not embrace a breach of covenant to repair, whether the damage is caused by ordinary wear and tear or an act of God"). However, before a finding of bad faith waste may be made, *Cornelison* requires a showing that defendant acted as a "reckless, intentional [or] malicious despoiler[ ] of property," rather than out of inability to make ends meet financially. 15 Cal.3d at 603–04, 542 P.2d 981, 125 Cal.Rptr. 557.

■ No such showing was made here. Mills made his mortgage payments for three of the six months the property was in his possession, and may have expended sums on maintenance as well. For the last three months, he diverted the income from the hotel to "other uses," FF No. 14, but there is no clear indication of what these other uses may have been. The only evidence on this point is Edwards' own testimony that Mills stopped making payments because "he was having money problems. ... [H]e was involved with some other properties, and needed a lot of money to deal with those properties, and that's why he had gotten behind." Reporter's Transcript at 76–77. This falls squarely

within the category of waste due to financial difficulties, protected by the anti-deficiency statute. *See Cornelison,* 15 Cal.3d at 603–04, 542 P.2d 981, 125 Cal.Rptr. 557.

■ We might well have reached a different conclusion had the evidence shown that Mills put little or no money into the hotel, attempting instead to milk it for as much cash as possible before abandoning it. Mills, however, paid approximately $50,000 in sales commissions, a down payment of $100,000, and three monthly payments of $8,000, for a total investment of some $174,000, not counting the additional $9,000 Mills claims he spent on maintenance. He received no more than $84,000 in rents, and probably considerably less.[1] Far from using the hotel as a means of generating profits at the expense of the security, Mills lost the bulk of his investment.

The BAP majority found additional indicia of bad faith in Mills' attempts to delay foreclosure by tendering checks to Edwards and then immediately stopping payment. This, however, is entirely consistent with Mills' financial difficulties. As Judge Volinn pointed out in his dissent below, a mortgagor's understandable desire to hold onto his property despite financial difficulties does not itself render him a reckless, intentional or malicious despoiler of property, at least when possession is retained only briefly after default.

### Conclusion

Sdrawde had the burden of proving that Mills' failure to perform adequate maintenance was the result of Mills' malicious, intentional or reckless acts, rather than merely his financial difficulties. The bankruptcy court made no such finding and our review of the trial record reveals no evidence that would have justified such a finding had it been made. Section 580b precludes recovery of any deficiency, so Sdrawde has no claim against Mills, dischargeable or otherwise.

REVERSED.

---

1. Edwards testified that the hotel yielded $14,000 in gross monthly revenue at the time of the sale, assuming full occupancy. At this rate, Mills would have collected $84,000 over the six months he was in possession. However, Mills testified that the gross receipts were only $7,000 the month after he took possession, and both he and Edwards agree that receipts were in the $6,000 to $7,000 per month range when the receiver was appointed in September 1981.

PREGERSON, Circuit Judge, dissenting:

I believe the majority opinion misconstrues the case law relating to bad faith waste and consequently reaches the wrong result in this case. In this case, the trial court found that the debtor acquired the subject property—a residential hotel for transients—in good condition and in compliance with applicable codes and ordinances. (Tr. Ct. Finding # 11) The trial court also found that Mills was an experienced owner-manager of commercial property who "understood the requirements for regular maintenance, operation, and management of the premises." (Tr. Ct. Find. # 12–13) Yet by the time the deed was foreclosed, the hotel had deteriorated to such an extent that 48 of the 67 rooms and several of the communal bathrooms, hallways, and stairways violated state and city housing laws, the county fire department had cited the building for various code infractions, and the hotel had become infested with rodents, cockroaches and other vermin. (Tr. Ct. Finding # 17) Nonetheless, the majority reverses the trial court's conclusion, upheld by the BAP, that Mills' utter failure to maintain the property constituted bad faith waste, rendering his debt nondischargeable. I disagree.

The majority bases its holding on *Cornelison v. Kornbluth*, 15 Cal.3d 590, 542 P.2d 981, 125 Cal.Rptr. 557 (1975), but misapprehends the holding of that decision. According to the majority, "Sdrawde's claim depends on whether the evidence produced at trial was sufficient to establish that Mills committed 'bad faith' waste rather than merely failed to maintain the property because of economic difficulties." *Op.* at 904. *Cornelison* does not set up any such dichotomy between "bad faith" waste and damage resulting from the debtor's "economic difficulties." Rather, *Cornelison* draws the distinction between "bad faith" waste and damages caused by a general "economic downturn" or waste which results "solely or primarily" from "the economic pressures of a market depression...." *Cornelison*, 15 Cal.3d at 604, 542 P.2d 981, 125 Cal.Rptr. 557. *Cornelison*, in fact, expressly holds that "recovery for waste against the mortgagor following nonjudicial foreclosure sale is barred by [Cal.Civ.Proc.Code § 580's] proscription against deficiency judgments *when the waste actually results from the depressed*

*condition of the general real estate market* but not when the waste is caused by the 'bad faith' acts of the mortgagor." *Id.* at 605, 542 P.2d 981, 125 Cal.Rptr. 557 (emphasis added).

In *Hickman v. Mulder*, 58 Cal.App.3d 900, 908, 130 Cal.Rptr. 304 (1976), the court reiterated that this distinction is controlling. The *Hickman* court saw the issue in *Cornelison* as "whether the decline in the value of the security has been the result of bad faith waste or *has resulted from the depressed condition of the general real estate market." Hickman*, 58 Cal.App.3d at 907, 130 Cal.Rptr. 304 (emphasis added). *Hickman* then explained that an appropriate affirmative defense to an allegation of bad faith waste would "assert that the impairment of the security resulted from a decline in real estate values...." *Id.* at 909, 130 Cal.Rptr. 304. Mills has made no such argument here.

Nowhere does *Hickman* or *Cornelison* state that economic difficulties *peculiar to the debtor* (as opposed to those caused by a depressed real estate market generally) establish a viable defense to allegations of bad faith waste. We would expect *any* debtor seeking protection of the bankruptcy laws to be in a position of serious economic distress. *Cornelison* does not stand for the proposition that such individual circumstances *alone* can insulate the debtor from charges of bad faith waste.

The question whether a debtor has committed bad faith waste is one, according to *Cornelison*, for the trier of fact. *Cornelison* plainly declares that the cause of an impairment to a security—whether it is a general economic decline or bad faith waste—is to be ascertained by the trier of fact. *Cornelison*, 15 Cal.3d at 604, 542 P.2d 981, 125 Cal.Rptr. 557. *See also Hickman*, 58 Cal.App.3d at 908, 130 Cal.Rptr. 304. The trial judge in this case found that Mills' total refusal to maintain the property constituted bad faith waste. We will not overturn the trial court's factual findings unless we find them clearly erroneous. Mills had the burden of presenting sufficient evidence to give the court "the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92

L.Ed. 746 (1948)). He has failed to meet this burden. *Cornelison* defines bad faith waste as waste committed recklessly, intentionally, or maliciously. *Cornelison*, 15 Cal.3d at 604, 542 P.2d 981, 125 Cal.Rptr. 557. The majority concedes that, under *Hickman*, neglect and inaction clearly can constitute bad faith waste. *See Hickman*, 58 Cal.App.3d at 908, 130 Cal.Rptr. 304. Yet, the majority fails to distinguish *Hickman*. In that case the court found that:

> An allegation that the defendants "failed to cultivate, irrigate, fertilize, fumigate, prune and do all other acts necessary to preserve said citrus trees and vines" without question makes out a case for waste. This, coupled with the allegation of "willful mismanagement" brings the pleading effort within the concept of bad faith waste ... and entitles the beneficiaries of the deed of trust to take their case to the trier of fact for determination of whether bad faith waste has actually been committed.

*Id.*

Mills' refusal to clean, repair or otherwise maintain the hotel is no different, nor any less crucial to maintaining the value of the security, from the agricultural neglect involved in *Hickman*. Thus, there can be no question that the *type* of conduct involved here may constitute bad faith waste. The only remaining issue is whether the damage caused by Mills' inaction was committed recklessly or intentionally.

The trial court found that Mills was an experienced property owner/manager who acquired the property in good condition. The trial court further found that Mills "willfully mismanaged" the property, causing its deteriorated condition, and that he delayed foreclosure by tendering checks, but then stopping payment on them. There was also evidence that Mills ignored Edwards' advice and refused for three months before the foreclosure to apply any funds to make desperately needed repairs. Mills has not shown any of these factual determinations to be clearly erroneous. These facts amply support the trial court's

conclusion that Mills committed bad faith waste.

*Krone v. Goff,* 53 Cal.App.3d 193, 127 Cal.Rptr. 390 (1975), is easily distinguishable. *Krone* involved impairment to a security resulting from an earthquake, fire, and the purchaser's failure to pay taxes. *Krone* held only that damage caused by "ordinary wear and tear," an Act of God, or mere failure to pay taxes does not suffice to establish waste. *Krone*, 53 Cal. App.3d at 195, 127 Cal.Rptr. 390. Clearly Mills' willful neglect of the property here cannot be attributed to an Act of God and far surpasses ordinary wear and tear.

Because I find that Mills does owe a debt to Sdrawde for bad faith waste committed on the property, the question then becomes whether Mills' acts constitute "willful and malicious injury" under 11 U.S.C. § 523(a)(6). We defined "willful and malicious injury" under that section in *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir. 1986). In *Cecchini*, we held that "when a wrongful act ... done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Id.* Mills' refusal to make any repairs or otherwise maintain the property, while he diverted funds to other uses, was wrongful, and Mills certainly knew the consequences of such acts. Consequently, I believe that Mills' debt to Sdrawde, arising from his commission of bad faith waste, should not be discharged.

For the reasons set forth above, I dissent from the majority's reversal of the bankruptcy appellate panel's decision.